## IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2000-KA-00894-SCT

*GARY HOPKINS a/k/a GARY L. HOPKINS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/17/2000 |
| TRIAL JUDGE: | HON. KENNETH L. THOMAS |
| COURT FROM WHICH APPEALED: | TUNICA COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | ALLAN D. SHACKELFORD |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: DEWITT T. ALLRED, III |
| DISTRICT ATTORNEY: | LAURENCE Y. MELLEN |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 11/08/2001 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 11/29/2001 |

### BEFORE PITTMAN, C.J., SMITH, P.J., AND WALLER, J.

### PITTMAN, CHIEF JUSTICE, FOR THE COURT:

¶1. Gary Hopkins (Hopkins) appeals his conviction in the Circuit Court of Tunica County for vehicular manslaughter while driving under the influence of alcohol. Hopkins was tried and convicted the same day and later sentenced by Judge Kenneth L. Thomas to twenty years in prison with five to be served under post-release supervision. By objection at trial, two questions were raised for this Court to consider: 1) whether it was reversible error to allow the investigating officer to testify about statements Hopkins made at the scene of the wreck and at the hospital without first informing him of his *Miranda* rights and 2) whether it was reversible error to admit Hopkins's medical records into evidence.

### FACTS

¶2. Joyce H. Canups (Canups) died after being injured at the intersection of U.S. Highway 61 and Casino Center Drive in Tunica County, Mississippi, when the car she was driving was struck from behind by a red pickup truck allegedly being driven by Gary Hopkins. About forty minutes after the wreck, Mississippi Highway Safety Patrol Sergeant William Williamson arrived at the scene of the wreck and began an investigation into its cause. There he found Hopkins wrapped in a blanket and seated in the median of the highway. Sergeant Williamson approached Hopkins and asked him if he was the driver of the red pickup to which Hopkins responded affirmatively. Sergeant Williamson also asked if Hopkins was the only occupant of the pickup, and Hopkins again answered affirmatively. Hopkins also told Sergeant Williamson that he did not see the car Canups was driving until he had hit it. During this conversation, Sergeant Williamson noted that Hopkins appeared intoxicated as his eyes were glassy and bloodshot and he smelled of alcohol. Sergeant Williamson also observed Hopkins had blood on his hands and face. Williamson then inspected

Hopkins's red pickup.

¶3. Williamson found beer bottles and cans in the bed and cab of the pickup. He also saw no signs to indicate another person was inside the truck at the time of the wreck. The windshield of the pickup was broken in a spider-web shape on the driver's side of the car but the passenger's side was only crossed with stress cracks. There was no blood on either the passenger's side or the driver's side of the truck.

¶4. Hopkins was transported to the hospital to be treated for his injuries. Sergeant Williamson followed Hopkins thirty minutes later, ostensibly to complete his accident report, and asked Hopkins again whether he was driving the red pickup and who else was in the car. Hopkins again admitted he was driving the pickup at the time of the wreck and made no mention of other passengers in the truck. At this time, it is apparent the Sergeant Williamson knew that Canups had died from her injuries and state law required him to obtain a blood sample from Hopkins. Therefore, Sergeant Williamson asked the hospital's lab technician to draw Hopkins's blood with a standard blood collection kit which he later forwarded to the Mississippi Crime Lab. Williamson testified that at no time was Hopkins under arrest. Hopkins was not informed of his *Miranda* rights either at the scene of the wreck or at the hospital.

¶5. This case has been tried four times. The first time, the trial judge declared a mistrial after Hopkins was brought before the jury wearing shackles. The second and third times, the jury could not reach a unanimous verdict and the judge again declared a mistrial. Lee Snipes, formerly incarcerated with Hopkins, testified in the third trial that Hopkins had told him that he was driving the pickup when the wreck happened. Snipes's testimony was read into the record after he could not be subpoenaed for the fourth trial. The State also introduced the medical records generated when Hopkins was treated at the hospital after the wreck as rebuttal to Hopkins's testimony. These records came into the hands of the State after Hopkins's counsel subpoenaed them from the hospital and provided the State with a copy during the third trial. Hopkins testified in his own defense in the final trial and claimed a friend, Tammy Hudsmith, was driving the pickup when the collision occurred.[1] He also claimed he never told Sergeant Williamson he was driving the pickup. In this fourth trial, the jury found Hopkins guilty of vehicular manslaughter while driving under the influence of alcohol.

## ANALYSIS

### I. WHETHER IT WAS REVERSIBLE ERROR TO ALLOW THE INVESTIGATING OFFICER TO TESTIFY ABOUT STATEMENTS HOPKINS MADE AT THE SCENE OF THE WRECK AND AT THE HOSPITAL WITHOUT FIRST INFORMING HIM OF HIS *MIRANDA* RIGHTS.

¶6. Hopkins first asks this Court to find the trial judge committed reversible error by allowing Sergeant Williamson to testify, over his objection, concerning statements Hopkins made at the scene of the collision and again at the hospital. It is uncontested that Hopkins was not informed of his *Miranda* rights prior to making the statements at either place. Hopkins asserts these statements were obtained in violation of his Fifth Amendment privilege against self-incrimination and only cites the holding of *Miranda v. Arizona* in support of his claim:

> [T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean

questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.

*Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). It is clear from this passage that Hopkins must be in custody when he made the statements in order for the privilege to apply. *Accord, Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); *Moore v. State*, 344 So.2d 731 (Miss.1977), *appeal after remand*, 374 So.2d 821 (Miss. 1979). The following excerpt appears further into the *Miranda* opinion and sheds more light on that Court's holding:

> Our decision is not intended to hamper the traditional function of police officers in investigating crime. . . . General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding.

*Miranda*, 384 U.S. at 477. The *Miranda* Court was concerned about the voluntariness of statements made in a coercive environment, given under a badge of intimidation and in conditions designed to subjugate the individual to the will of his examiner. *Id.* at 457.

¶7. This Court has previously held that certain situations are excluded from *Miranda's* scope. "In a non-custodial setting where interrogation is investigatory in nature (general on-the-scene-investigation), *Miranda* warnings are not required in order that a defendant's statements be admissible. Even in this setting, statements must be freely and voluntarily given in order to be admissible." *Porter v. State*, 616 So. 2d 899, 907 (Miss. 1993) (citing *Nathan v. State*, 552 So. 2d 99, 103 (Miss. 1989)). *See also Tolbert v. State*, 511 So. 2d 1368, 1375 (Miss. 1987). Whether *Miranda* applies in the case at bar is determined by answering whether Hopkins was in custody when he made the statements and whether he made them freely and voluntarily. The test for whether a person is in custody is whether a reasonable person would feel he was in custody and depends upon the totality of the circumstances. *Hunt v. State*, 687 So. 2d 1154, 1160 (Miss. 1996); *Porter*, 616 So. 2d at 907. The factors to be considered include the place and time of the interrogation, the people present, the amount of force or physical restraint used by the officers, the length and form of the questions, whether the defendant comes to the authorities voluntarily, and what the defendant is told about the situation. *Id.* "The key to determining if the questioning of a person is a custodial interrogation within the meaning of *Miranda* is whether the defendant is deprived of his freedom of action in any significant manner and whether he is aware of such restraint." *Roberts v. State*, 301 So. 2d 859, 863 (Miss. 1974).

¶8. Sergeant Williamson arrived on the scene at approximately 9:20 p.m., forty minutes after the wreck. As a routine part of his investigation, he asked general questions designed to determine who was involved, who needed medical assistance, and what happened. Hopkins was sitting in the median of the highway when Sergeant Williamson first interviewed him. Before he made the statements, Hopkins was not handcuffed or told he was under arrest by Sergeant Williamson or any other law enforcement officer present at the scene. Under these non-coercive conditions, we hold that Hopkins was not "in custody" for *Miranda* purposes, and the trial court did not commit error by allowing Sergeant Williamson to testify concerning the statements Hopkins made at the scene of the wreck. *Accord, Yazzie v. State*, 366 So. 2d 240 (Miss. 1979); *Ford v. State*, 226 So. 2d 378 (Miss. 1969); *Nevels v. State*, 216 So. 2d 529 (Miss. 1968).

¶9. What follows is Hopkins's testimony about a conversation that took place after he spoke to Sergeant Williamson the first time and right before he went to the hospital:

Q: Well, did you offer to go to the hospital?

A: Yes, sir. I was sitting there on the side of the road, one of the EMT's asked me if I wanted to go to the hospital, I told him no. I believe it was an EMT. I told him no and then he told me, he said, yeah, you can ether go to the hospital or you can -

Q: Who is he? Now wait a minute.

A: Officer Williamson. He told me, you either go to the hospital or you're going to jail. And the ambulance E.M.T there, told me, he said you need to get in that ambulance or they're going to take you to jail. And when they were loading me up, he said this the driver of the pickup.

Sergeant Williamson denied forcing Hopkins to go to the hospital. However, he and other EMTs convinced Hopkins to go to the hospital. The implication of Williamson's alleged statement is clear: If Hopkins did not go to the hospital, he would have been placed under arrest. At the hospital, Hopkins was being treated for his injuries when Sergeant Williamson began asking him questions again. It was approximately 10:00 p.m. when Williamson arrived. Hopkins was not told that he was under arrest nor handcuffed. After Hopkins answered the questions, Sergeant Williamson directed the hospital lab technician to draw a blood sample from Hopkins. Considered in the light of the option Hopkins had before being transferred to the hospital and his being forced to provide a blood sample while there, we find Hopkins's freedom was restrained enough to require informing him of his *Miranda* rights.

¶10. Where a *Miranda* violation has occurred, it will be considered harmless if the record demonstrates beyond a reasonable doubt that admitting the evidence was not prejudicial:

> Even in a case where a violation is demonstrated to have actually occurred, nevertheless, it will be considered harmless error if the whole record demonstrates beyond a reasonable doubt that it was without any substantial prejudicial effect under all of the facts and circumstances of the case. *United States v. Whitaker*, 592 F.2d 826 (5th Cir. 1979).
> In *United States v. Dixon*, 593 F.2d 626 (5th Cir. 1979), the Court said:
> The decision requires an examination of the facts, the trial context of the error, and the prejudice created thereby as juxtaposed against the strength of the evidence of defendant's guilt. (593 F.2d at 629).

*Cooley v. State*, 391 So. 2d 614, 623 (Miss. 1980). The evidence in the record strongly supports Hopkins's conviction as the statements made at the hospital were merely recitations of the statements made at the scene of the wreck. Hopkins admitted to Sergeant Williamson at the scene he was driving the truck. Hopkins told Lee Snipes the same thing. The sole impact on the windshield of the pickup was on the driver's side. Hopkins was bleeding from his face and chin. He was allowed to present his alternate explanation to the jury when he took the stand and testified that a friend, Tammy Hudsmith, was driving. Hudsmith was not at the scene when Sergeant Williamson arrived and there were no signs that another person occupied the truck when the wreck occurred. A witness also testified she had seen Hudsmith after the wreck and did not see any injuries. The jurors ultimately rejected Hopkins's explanation when they found him guilty. As Hopkins's statements at the hospital were merely repetitions of what he said at the scene and there is little in the record to suggest the hospital statements prejudiced Hopkins's defense in any way, we hold the trial court did not commit reversible error by allowing Sergeant Williamson to testify concerning them. This issue is without merit.

## II. WHETHER IT WAS REVERSIBLE ERROR TO ADMIT HOPKINS'S MEDICAL RECORDS INTO EVIDENCE.

¶11. Hopkins next asks this Court to find the trial court committed reversible error by allowing the prosecution to admit his medical records into evidence over his objection. These records were generated by the hospital the night of the wreck when Hopkins was treated for his injuries. In support of his claim he cites Rule 503 of the Mississippi Rules of Evidence which provides in part:

> A patient has a privilege to refuse to disclose and to prevent any other person from disclosing (A) knowledge derived by the physician or psychotherapist by virtue of his professional relationship with the patient, or (B) confidential communications made for the purpose of diagnosis or treatment of his physical, mental, or emotional condition, including alcohol or drug addiction, among himself, his physician or psychotherapist, and persons who are participating in the diagnosis or treatment under the direction of the physician or psychotherapist, including members of the patient's family.

Miss. R. Evid. 503(b). Hopkins merely cites the rule and neither he, nor the State, briefs the issue further. This privilege applies in criminal as well as civil trials. *Cotton v. State*, 675 So. 2d 308, 311 (Miss. 1996); *Ashley v. State*, 423 So. 2d 1311, 1314 (Miss. 1982); *Keeton v. State*, 175 Miss. 631, 167 So. 68 (1936). The first question which must be addressed is whether the privilege covers the medical records introduced at trial.

¶12. The medical records admitted into evidence were three documents: a chart, an admission and general conditions document, and an affidavit from the hospital records custodian coupled with a bill. They contain nurse's notes which provide in relevant parts that Hopkins was the unrestrained driver of a car involved in a motor vehicle accident and identifies Hopkins's chief injury as a facial laceration. Hopkins testified that before Sergeant Williamson arrived, x-rays of his chest area were also taken. It appears from these facts that Hopkins was talking only to medical professionals who were taking notes on his condition, diagnosing his injuries, and treating him after the wreck. The facts the nurse's notes were based upon was information learned within the course of treatment. *See Sessums v. McFall*, 551 So. 2d 178, 180-81 (Miss. 1989). The trial court found these records to be privileged. We therefore conclude the Rule 503 evidentiary privilege does apply to exclude the medical records from evidence as the trial court found. A patient, however, can waive the privilege.

¶13. The next question to be answered is whether Hopkins's actions before and during trial were sufficient to waive his physician-patient privilege. If a patient puts his health in issue at trial, he waives his physician-patient privilege. *Holland v. State*, 705 So. 2d 307, 334, 335 (Miss. 1997); Miss. R. Evid. 503(f). Furthermore:

> Where a patient voluntarily goes into detail regarding the nature of her injuries and either testifies as to what the particular physician did or said while in attendance, or relates what she communicated to the physician, the privilege is waived . . . .

*Dennis v. Prisock*, 254 Miss. 574, 584, 181 So. 2d 125, 128 (1965), *appeal after remand*, 221 So. 2d 706 (Miss. 1969) (patient waived privilege where she showed the jury her surgical scar and went into detail about her injuries); *see also* 8 Wigmore, Evidence § 2389, at 855-61 (McNaughton rev. 1961). "The party's *reference* in his testimony to his *communications with a physician* should be deemed a waiver of the privilege as to that physician's knowledge. Otherwise, the privilege offers a license to perjury." *Id*. at 859

(emphasis in original & footnote omitted). Once the privilege has been waived, it cannot be reinstated:

> A waiver at a *former trial* should bar a claim of the privilege at a later trial for the original disclosure takes away once and for all the confidentiality sought to be protected by the privilege.

*Id.* at 860-61 (emphasis in original & footnote omitted).

¶14. When Hopkins took the stand in his own defense at the fourth trial, he went into detail about where he was hurt and made great issue of it. Indeed, he denied the assertion that his forehead was injured because that would indicate his head caused the damage to the driver's side of the windshield of the pickup and therefore driving when the wreck occurred. He told the trial court and jury the full extent of his injuries and what he had told the nurse that night at the hospital. The mere act of obtaining his medical records by subpoena might not have waived the privilege, and we do not address this issue here. However, it is difficult to see how Hopkins intended the medical records to remain confidential when he provided a copy of those records to the prosecutor during the third trial--who could, at his convenience, provide the information to anyone he chose--and placed a copy of the records into the court file for the public to see. In light of these steps Hopkins has taken, we hold the trial court's admission of the records as rebuttal to Hopkins's testimony at the fourth trial was not error as Hopkins had waived his physician-patient privilege.

## CONCLUSION

¶15. The trial judge did not err in allowing Sergeant Williamson to testify about statements Hopkins made to him at the scene of the wreck without first informing Hopkins of his *Miranda* rights. While it was error to allow Williamson to testify about Hopkins's statements at the hospital, it does not warrant reversing Hopkins's conviction. Hopkins waived his physician-patient privilege where he took steps which made the information available to the public and put his health at issue at trial. Therefore, his conviction and sentence for vehicular manslaughter are affirmed.

¶16. **CONVICTION OF VEHICULAR HOMICIDE AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITH FIVE (5) YEARS OF POST-RELEASE SUPERVISION TO COMMENCE AFTER THE APPELLANT HAS SERVED FIFTEEN (15) YEARS, AFFIRMED. SAID SENTENCE SHALL RUN CONSECUTIVELY TO ANY AND ALL SENTENCES PREVIOUSLY IMPOSED.**

> **McRAE, P.J., SMITH, WALLER, COBB, DIAZ AND EASLEY, JJ., CONCUR. CARLSON AND GRAVES, JJ., NOT PARTICIPATING.**

1. Hudsmith died three weeks after the wreck and did not testify on Hopkins's behalf at trial or provide a statement to the police.